AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT

05/26/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____Ah_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

May 26, 2026

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ch___ DEPUTY

| | |
|---|---|
| United States of America <br><br> v. <br><br> PAUL BETANCOURT and <br> SYLVIA BETANCOURT, <br><br> Defendants | Case No.  2:26-mj-03110-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between in or around March of 2023 until in or around September of 2023 in the county of Santa Barbara in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Provide Contraband to Federal Inmate |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Andrew Howard, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:          **May 26, 2026**

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Brianna Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: Christopher C. Kendall (x2576)

**AFFIDAVIT**

I, Andrew Howard, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Department of Justice, Office of the Inspector General ("DOJ OIG"), and have been since July 2017. Prior to joining DOJ OIG, I worked as Special Agent with Homeland Security Investigations ("HSI") from 2010 to 2017. As a DOJ OIG Special Agent, I have investigated various federal crimes, including crimes involving fraud, public corruption, and civil rights. As an HSI Special Agent, I investigated various federal crimes, including crimes involving financial transactions, distribution of narcotics and other controlled substances, and human trafficking. As a federal agent, I am authorized to investigate violations of the laws of the United States, and to execute warrants issued under the authority of the United States.

2.   As part of my training, I have learned about a number of investigative techniques including, but not limited to, interviewing targets, subjects, and other witnesses, reviewing financial records, reviewing electronic evidence including information from emails and social media websites, and conducting search warrants of electronic devices, residences, email accounts, and other locations. Through my training, experience, and my discussions with other experienced law enforcement officer and agents, I am familiar with the methods of operations used by correctional officers who attempt to

engage or engage in the introduction of contraband into federal prisons, and the types of authorized communication allowed by BOP inmates.

3.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

## II. **PURPOSE OF AFFIDAVIT**

4.    This affidavit is made in support of a criminal complaint against, and arrest warrants for, PAUL BETANCOURT and SYLVIA BETANCOURT for a violation of 18 U.S.C. § 371: Conspiracy to Provide Contraband to Federal Inmate.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

2

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.  Background on FCI Lompoc and PAUL BETANCOURT**

6.  The Bureau of Prisons ("BOP") Federal Correctional Complex Lompoc ("FCC Lompoc") is an all-male low security federal correctional institution composed of two Federal Correctional Institutions ("FCI Lompoc I" and "FCI Lompoc II") with an adjacent minimum-security satellite camp located in Lompoc, California.

7.  Beginning in July 2012, PAUL BETANCOURT was a correctional officer at FCC Lompoc. From 2012 to 2023, PAUL BETANCOURT remained a correctional officer with regular promotions in grade. As a correctional officer, PAUL BETANCOURT had disciplinary authority over inmates incarcerated at FCC Lompoc. PAUL BETANCOURT was required to conduct his work and supervise inmates in accordance with BOP policies and procedures. He was advised, as part of his training, that he could not maintain inappropriate relationships with inmates, which included becoming financially involved with inmates or former inmates. He was also advised, as part of his training, that he could not introduce or attempt to introduce contraband into or upon the grounds of any Federal correctional institution.

8.  As a result of the investigation summarized below, PAUL BETANCOURT was placed on administrative leave on or about September 6, 2023.

B.    **Initiation of the Investigation**

9.    On or about August 28, 2023, an inmate ("Inmate 1") at FCC Lompoc reported to BOP Special Investigative Agent Dale Kietzman that PAUL BETANCOURT was introducing contraband into FCC Lompoc and being paid to do so by another inmate ("Inmate 2") through the Cash App digital money transfer application.

10.    In particular, Inmate 1 told BOP that his family gave approximately $3,000 to Inmate 2 so that Inmate 2 could pay PAUL BETANCOURT to introduce contraband into FCC Lompoc. Inmate 1 said PAUL BETANCOURT was introducing suboxone, K2,[1] and vape pens into FCC Lompoc. Witness 1 said his family paid approximately $3,000 to a Cash App account "cashtag," or username, identified as "MIA1437,"[2] which Inmate 1 claimed belonged to Inmate 2.

11.    Inmate 1 said Inmate 2 borrowed money from Inmate 1 to pay PAUL BETANCOURT. Witness 1 said Inmate 2 told him PAUL BETANCOURT was asking for more money from Inmate 2 to bring in the contraband. Inmate 1 said Inmate 2 contacted Inmate 1's grandmother, L.B., via phone to arrange the transfer of $3,000

---

[1] K2, also known as "Spice," is a trade name for a synthetic designer drug intended to mimic THC, the main psychoactive ingredient in marijuana.

[2] Cash App is a digital wallet allowing person-to-person money transfers. Cash App users link their Cash App accounts to a funding source, typically a bank account. Individual Cash App users are verified by Cash App using names, dates of birth, and social security numbers, as well as phone numbers, addresses, and email addresses. Cash App users are identified within the system by an assigned unique account token. Cash App users are identified to other users through a unique username they choose known as a "cashtag." Users may also select a display name to further identify themselves. Both cashtags and display names can be changed at the user's discretion, but a Cash App user will only have one cashtag or display name at a time to represent their account.

4

to Inmate 2 in July or August 2023. Inmate 1 said the money was transferred via Cash App to Inmate 2's account using the cashtag MIA1437. Inmate 1 said Inmate 2 was supposed to pay the money back to L.B. but had not as of September 2023. Inmate 1 said that inmates generally did not have access to Cash App within the prison, so Inmate 2 called his half-sister, A.D., to conduct the transactions via Inmate 2's Cash App.

12.  On September 6, 2023, during an interview with DOJ OIG, Inmate 1 said Inmate 2 said PAUL BETANCOURT had been bringing contraband items, such as vape pens, Suboxone, and K2, into FCC Lompoc. Inmate 1 said Inmate 2 was introduced to PAUL BETANCOURT by another BOP inmate who transferred from FCC Lompoc to FCC Victorville when FCC Lompoc was converted from a medium security facility to a low security facility. Inmate 1 said Inmate 2 usually requested contraband items from PAUL BETANCOURT when Inmate 2 was able to pay PAUL BETANCOURT, and PAUL BETANCOURT usually brought the items on Wednesdays when he came to work. Inmate 1 said Inmate 2's family, most likely his sister, met with BETANCOURT outside the facility and gave BETANCOURT the items he was to smuggle into FCC Lompoc.

13.  As detailed below, DOJ OIG interviewed Inmate 2's half-sisters, A.D. and V.T., who confirmed meeting with either PAUL BETANCOURT or a woman, later identified as PAUL BETANCOURT's wife, SYLVIA BETANCOURT.

**C.    Cash App Account MIA1437 Is Linked to Inmate 2**

14.  As part of the investigation, DOJ OIG obtained various financial records establishing the link between Inmate 2 and

5

Cash App account MIA1437.  Specifically, records provided by Cash App show that the user associated with cashtag MIA1437 had the same name, date of birth, and last four digits of social security number as Inmate 2. The records further showed that the account was created from an iPhone on January 6, 2022.

15.  This Cash App account was shown to be tied to a Sutton Bank account ending in 3181. This Cash App account was also shown to be tied to a virtual and physical debit card ending in 6888, issued by Sutton Bank on January 8, 2022, two days after the Cash App account was made. Sutton Bank is a partner bank for Cash App, providing routing and account numbers for Cash App users. Sutton Bank also issues the "Cash Card;" a Cash App debit card to facilitate direct deposits. Sutton Bank does not issue, maintain, or monitor account and transaction information in Cash App.

16.  The transaction records showed that a person identified as Inmate 1's former girlfriend, sent $7,270 to MIA1437 and confirmed that L.B., noted above, sent $6,150 to MIA1437.

17.  The records also showed that sixteen individuals sent exactly $100 to MIA1437, while 29 individuals sent amounts between $105 and $900. Analysis of transaction records for MIA1437 showed that in 2022, almost monthly payments were made to a Cash App account linked to A.D. The amount sent from MIA1437 to A.D. from December 2022 to February 2023 totaled less than $400. Between May 16 and September 9, 2023, payments from

6

MIA1437 to A.D.'s Cash App totaled over $10,000. Details of specific transactions are described below.

**D.    Cash App Accounts Associated with PAUL and SYLVIA BETANCOURT**

18.   As part of the investigation, DOJ OIG obtained various financial records related to PAUL and SYLVIA BETANCOURT.

19.   A review of records showed that PAUL BETANCOURT's wife, SYLVIA BETANCOURT, was associated with a Cash App account with the active account token C_0j2y1amve and using the cashtags sylviarobetty7, ashledee3, and amygee3 at various times. Records from Cash App showed the account was registered to SYLVIA BETANCOURT, with a date of birth of February 1, 1977, and a social security number ending in 9762, matching SYLVIA BETANCOURT's date of birth and social security number. This Cash App account was shown to be linked to a Coast Hills Credit Union account ending in 8451, as well as three different Coast Hills Credit Union cards and a Cash App Card.

20.   According to records from Coast Hills Credit Union, the account ending in 8451 was owned by both PAUL BETANCOURT and SYLVIA BETANCOURT.

21.   Between May and September 2023, A.D. (Inmate 2's sister) sent $6,650 to SYLVIA BETANCOURT's Cash App account.

22.   Specifically, A.D. made fourteen payments to SYLVIA BETANCOURT's Cash App account, with the first on May 16, 2023, for $400, and the last on September 9, 2023, for $850. The highest amount A.D. paid to SYLVIA BETANCOURT's Cash App was $1,500 on August 1, 2023, and the lowest was $100 on June 6,

7

2023. Conversely, SYLVIA BETANCOURT made three payments of $1 each to A.D. on July 31, August 7, and August 12, 2023. Details of specific transactions are listed below.

23.   Between May 23, 2023, and September 6, 2023, SYLVIA BETANCOURT made eight payments from her Cash App account to a debit card ending in 5198 and linked to PAUL and SYLVIA BETANCOURT's joint account at Coast Hills Credit Union ending in 8451. These payments totaled $1,180.66.

**E.    Review of Emails, Recorded Phone Calls, and Cash App Transactions Demonstrate Links between MIA1437 and the BETANCOURT's Cash App Account**

24.   BOP provided DOJ OIG with inmate emails in which the Cash App account believed to belong to Inmate 2, MIA1437, was mentioned. A review of the emails showed that MIA1437 was mentioned over 150 times by various inmates.  Additionally, many of the mentions of MIA1437 came with requests to send $100 to MIA1437, which, according to BOP,[3] was the cost for purchasing suboxone strips.

25.   Additionally, Cash App records showed that between January 2022 and August 2023, MIA1437 sent $21,848 to A.D., who was identified as Inmate 2's sister, and an additional $3,624 to V.T., who was identified as Inmate 2's other half-sister.

26.   For example, from January 2022 to February 2023, MIA1437 sent several transfers to A.D.'s Cash App account in amounts less than $400, but spiking between March 2023 and

---

[3] BOP Special Investigative Agent D. Kietzman stated in a memo dated August 29, 2023, to the warden, FCC Lompoc, that $100 was the amount suboxone strips were selling for in the prison at that time.

August 2023 to over $1,600 per month, with a high of over $5,000 in August 2023.

27.  Meanwhile, a review of Inmate 2's prison calls from March to September 2023 showed multiple calls to phone numbers associated with his sisters -- A.D. and V.T. -- in which Inmate 2 instructed them to contact or send money to a Cash App account associated with SYLVIA BETANCOURT. As noted below, Inmate 2 explained that rather than send money directly from his Cash App account to PAUL BETANCOURT, Inmate 2 arranged for money to be sent from A.D.'s Cash App account to SYLVIA BETANCOURT's Cash App account to provide a level of security and protection to himself and PAUL BETANCOURT.

28.  For example, on June 1, 2023, Inmate 2 called A.D. and directed her to send $400 to herself, and then, "the one that requested it last time, I want you to send it there." Inmate 2 further directed her to add a note to the transaction asking the recipient to "please call or text" V.T.'s number. A review of SYLVIA BETANCOURT's Cash App transactions showed that, consistent with the above, on June 1, 2023, A.D. sent $400 to SYLVIA BETANCOURT's Cash App with the note, "plz call or text [V.T.]" and further identifying a phone number ending in "5258," which V.T. later confirmed to be V.T.'s phone number.

29.  On July 15, 2023, Inmate 2 called A.D. and directed her to "send that five and put in the note 'call [V.T.]' and give the phone number." A review of SYLVIA BETANCOURT's Cash App transactions showed that on July 15, 2023, she received $500

9

from A.D., with the note, "call me plz -[V.T.]," including the phone number ending in "5258."

30.  On July 24, 2023, Inmate 2 called V.T. and told her to check her mail because Inmate 2 was expecting "legal paperwork." In a call on July 30, 2023, V.T. confirmed to Inmate 2 that she received a sheet of paper, which she described as a handwritten "Jesus scripture" with a "weird texture." In call later that day, Inmate 2 confirmed that the paper was the one he was expecting.

31.  On July 26, 2023, Inmate 2 called A.D. and directed her to "send five" from her account. A review of SYLVIA BETANCOURT's Cash App transactions showed that on July 27, 2023, she received $500 from A.D.

32.  A review of SYLVIA BETANCOURT's Cash App transactions showed that on July 31, 2023, she sent $1 to A.D. On August 6, 2023, Inmate 2 called A.D. and directed her to "give [V.T.] five and send five off of yours." Inmate 2 also asked if another dollar showed up. Inmate 2 told A.D. to write "thank you" as a note. A review of Inmate 2's Cash App transactions showed that on August 7, 2023, at 8:44 PM, Inmate 2 sent $500 to A.D. SYLVIA BETANCOURT's Cash App transactions showed that on August 7, 2023, at 8:45 PM, A.D. sent $500, with the note, "thank you."

33.  On August 1, 2023, Inmate 2 called V.T. and complained that he could not get in touch with A.D. Inmate 2 asked V.T. to contact A.D. and have her "send 15 to the person on her account." A review of SYLVIA BETANCOURT's Cash App transactions showed that on August 1, 2023, she received $1,500 from A.D.

10

34.   On August 4, 2023, Inmate 2 called V.T. and told her to text his "friend" to arrange a meeting, preferably for Sunday (August 6, 2023). On August 6, 2023, at 5:28 PM, Inmate 2 called V.T., who said she was getting in the car to drive to get something from A.D. and then drive to Lompoc. V.T. told Inmate 2 she already talked to "them" and told "them" she would be late.

35.   A review of FCC Lompoc video camera footage on August 9, 2023, showed Inmate 2, empty-handed, entering PAUL BETANCOURT's office in F-Unit at 6:43 AM and interacting with PAUL BETANCOURT. At 6:44 AM, Inmate 2 exited the office carrying what appeared to be a sheet of paper.

36.   On September 1, 2023, Inmate 2 called A.D. and told her to "send my wife 850." He further directed A.D. to put write "happy holidays" as a note on the transaction. A review of SYLVIA BETANCOURT's Cash App transactions showed that on September 2, 2023, she received $850 from A.D., with the note, "happy holidays." As noted below, Inmate 2 later admitted that he used "wife" as coded language referring to SYLVIA BETANCOURT, not Inmate 2's actual wife.

37.   In sum, between May 16, 2023, and September 2, 2023, Inmate 2 sent at least $10,350 to A.D. via Cash App. During that same time, A.D. sent at least $6,650 to SYLVIA BETANCOURT via Cash App, with several large amounts being transferred to SYLVIA BETANCOURT within minutes of being received by A.D. from Inmate 2. Between April 15 and September 5, 2023, Inmate 2 sent at least $3,664 to V.T. via Cash App.

11

**F.      Seizure of Controlled Substances**

38.   Like the August 9, 2023 video footage summarized above, FCC Lompoc video camera footage on September 6, 2023, showed Inmate 2, empty-handed, entering PAUL BETANCOURT's office in F-Unit at 6:51 AM and interacting with PAUL BETANCOURT. At 6:54 AM, Inmate 2 exited the office with what appeared to be several sheets of paper.

39.   Shortly thereafter, a BOP correctional officer contacted Inmate 2 and asked why Inmate 2 was in F-Unit.  Inmate 2 refused to answer and was then placed in a holding cell and searched. Two papers, which appeared to have been soaked in an unknown substance, were found in an envelope on Inmate 2's person.

40.   An initial test of the papers using a Narcotics Identification Test Kit ("NIK") indicated the presence of opium alkaloids. Subsequent tests on the papers confirmed positive for Buprenorphine HCL (Suboxone), a Schedule III narcotic drug controlled substance. A search of Inmate 2's cell resulted in the discovery of two orange waxy papers hidden in a slit cut into his mattress. Testing of the squares resulted in positive tests for Buprenorphine HCL (Suboxone).

**G.      Inmate 2 Admits Coordinating with His Half-Sisters — A.D. and V.T. — to Use Cash App Account MIA1437 to Pay PAUL and SYLVIA BETANCOURT for Contraband**

41.   On March 17, 2026, during an interview with DOJ OIG, Inmate 2 admitted to paying PAUL BETANCOURT to bring contraband items into FCC Lompoc. Inmate 2 confirmed that he was the owner of the Cash App account MIA1437.

42.   Inmate 2 said he learned from other inmates that PAUL BETANCOURT was providing vape pens and cartridges, both contraband items, to inmates. Inmate 2 said he arranged to pay PAUL BETANCOURT to bring in vape pens for his personal use. Inmate 2 said he did not pay BETANCOURT directly but had Inmate 2's sister, A.D., withdraw money from Inmate 2's Cash App account, which he admitted was MIA1437, to her Cash App account. Inmate 2 then directed A.D. to transfer money from her Cash App account to SYLVIA BETANCOURT's Cash App account. Inmate 2 said he arranged the transactions in this manner to provide a layer of protection to himself and PAUL BETANCOURT. Inmate 2 stated that he was married, but clarified that when he told A.D. to send payments to his "wife," that was coded language referring to SYLVIA BETANCOURT, not Inmate 2's actual wife.

43.   Inmate 2 said he directed A.D. to purchase vape pens and other accessories, which she gave to V.T. to transport to Lompoc. V.T. in turn drove the contraband items to Lompoc, where she provided the contraband items to PAUL BETANCOURT or SYLVIA BETANCOURT. Inmate 2 said that the vapes were for his personal use. Inmate 2 admitted that he arranged for packets of papers soaked in suboxone to be brought in by PAUL BETANCOURT. Inmate 2 said he approached PAUL BETANCOURT, who agreed to bring in the suboxone for a payment of $3,000.

H.    **A.D. Admits Coordinating with Her Sister (V.T.) to Help Their Brother (Inmate 2) Obtain Contraband and/or Pay SYLVIA BETANCOURT via Cash App**

44.   On March 30, 2026, during a proffer interview, A.D. admitted to moving money on behalf of Inmate 2 since

13

approximately 2017. She said she typically sent and received small amounts, between $100 and $500, to and from the friends and families of inmates. A.D. said that in 2023 she began sending money to SYLVIA BETANCOURT, at Inmate 2's direction. A.D. stated she did not know SYLVIA BETANCOURT outside of Inmate 2 directing her to send money to and communicate with SYLVIA BETANCOURT. A.D. noted that the amounts were significantly larger, often $800 or $1,000 at a time. A.D. added that all the money paid to SYLVIA BETANCOURT was first withdrawn from Inmate 2's Cash App account under the cashtag "MIA1347." A.D. also forwarded money to V.T. at Inmate 2's direction, but A.D. believed this money was only to cover V.T.'s expenses while driving to Lompoc.

45.  A.D. said Inmate 2 asked her to buy vape pens and accessories for him. A.D. said she purchased the requested items, packaged them, and gave them to V.T. to drive to Lompoc.

46.  As noted above, between May 23, 2023, and September 6, 2023, SYLVIA BETANCOURT made eight payments from her Cash App account to a debit card ending in 5198 and linked to PAUL and SYLVIA BETANCOURT's joint account at Coast Hills Credit Union ending in 8451. These payments totaled $1,180.66.

**I.   V.T. Admits Helping Her Brother (Inmate 2) Obtain and Deliver Contraband to PAUL and SYLVIA BETANCOURT**

47.  On March 23, 2026, during a proffer interview, V.T. admitted to driving to Lompoc and delivering various packages to PAUL BETANCOURT and SYLVIA BETANCOURT at Inmate 2's direction. V.T. positively identified PAUL BETANCOURT and SYLIVA BETANCOURT

14

after being shown copies of each of their driver's license photographs.

48.  V.T. said that Inmate 2 initially told her he would set her up on a date with a correctional officer at the prison, who Inmate 2 referred to as his "friend." V.T. said she was expecting a phone call from the "friend," but instead received a phone call from a woman calling herself "Sylvia." Around the same time, Inmate 2 told V.T. to expect a package, which he asked her to deliver to his "friend." V.T. said she did receive a package from an unknown person in the form of a manila envelope. V.T. said she then arranged to deliver the package to "Sylvia" (SYLVIA BETANCOURT) in Lompoc, California.

49.  V.T. said she received a second package, which contained what appeared to be a religious flyer. Inmate 2 instructed V.T. to bring the package to Lompoc and deliver it to the "friend." V.T. said she met with SYLVIA BETANCOURT a second time and delivered the package.

50.  V.T. said she received a third package from A.D., which was similar to a bubble-wrap mailer containing a small box. V.T. took this package to Lompoc, where she delivered it to PAUL BETANCOURT and SYLVIA BETANCOURT. V.T. said PAUL BETANCOURT made her uncomfortable and told her, "When you talk to your brother (Inmate 2) you tell him I need more money."  V.T. said she did not know what was in the packages that she delivered to PAUL BETANCOURT and SYLVIA BETANCOURT.

15

## IV. <u>CONCLUSION</u>

51.  For all the reasons described above, there is probable cause to believe that PAUL BETANCOURT and SYLVIA BETANCOURT have committed a violation of 18 U.S.C. § 371: Conspiracy to Provide Contraband to Federal Inmate.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of May, 2026.

_____
HON. BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE

16